## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| **In Re:**<br><br>　　　**COROTOMAN, INC,**<br><br>　　　　　　　　　　　**Debtor** | **CASE NO. 2:19-bk-20134**<br>**CHAPTER 11** |
| **COROTOMAN, INC.,**<br>　　　　　　　　　**Plaintiff,**<br><br>**v.**<br><br>**CENTRAL WEST VIRGINIA REGIONAL**<br>**AIRPORT AUTHORITY CORPORATION,**<br><br>　　　　　　　　　**Defendant.** | **CASE NO _____**<br>**Adversary Proceeding** |

### COMPLAINT

**COMES NOW** Plaintiff/Debtor, Corotoman, Inc., by and through the undersigned counsel, brings this complaint against Defendant, Central West Virginia Regional Airport Authority, Inc. alleging as follows:

### PARTIES

1.　　　Corotoman, Inc. ("Plaintiff/Debtor" or "Corotoman") is a West Virginia corporation organized and existing under the laws of the State of West Virginia with its offices and principal place of business located in Charleston, West Virginia.

2.　　　Corotoman is owned and controlled by John Wellford, who is a citizen and resident of West Virginia.

3.　　　Defendant Central West Virginia Regional Airport Authority, Inc. ("Defendant" or "the Airport Authority") is a political subdivision.

4.      At all relevant times the Airport Authority owned and operated the largest airport in West Virginia, Yeager Airport ("Yeager") in Charleston, Kanawha County, West Virginia located 100 Airport Road, Suite 175, Charleston, West Virginia 25311.

5.      From 1999 through on or about July 18, 2015, Richard A. Atkinson, III ("Atkinson") was the acting airport director for Yeager.

6.      From on or about July 18, 2015 through the present, Terry D. Sayre ("Sayre") has been the acting airport director for Yeager.

7.      Prior to July 18, 2015 during the relevant time, Sayre was the assistant airport director for Yeager.

8.      Pursuant to the Rules and Regulations of Yeager, "DIRECTOR" means the person employed by the Airport Authority to supervise the operation and management of the Airport and his or her duly authorized representatives.

9.      As part of their management and supervision duties for Yeager, during the relevant time period as airport directors, Atkinson and Sayre had the authority to enter into contracts on behalf of Yeager and the Airport Authority.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2) and this Court may enter a final order consistent with these statutes and Article III of the United States Constitution.

11.      Venue in this matter is proper pursuant to Rule 7003 of the Federal Rules of Bankruptcy Procedure in that the Corotoman, Inc.'s Chapter 11 bankruptcy proceeding is pending in this Court bearing case number 2:19-bk-20134.

12.     At all relevant times the Airport Authority is and was a corporation doing business in Kanawha County, West Virginia.

## FACTS

13.     Corotoman realleges and incorporates by reference Paragraphs 1 through 12.

14.     Yeager sits on a man-made plateau that was constructed in the 1940s by removing portions of the ridge and hilltops.

15.     In the original grading process, more than 9 million cubic yards of earth and rock were moved with the aid of more than 2 million pounds of explosives.

16.     Yeager has a single asphalt runway, 5/23, 6,802 by 150 feet (2,073 x 46 m).

17.     In or around the mid-2000s, the Airport Authority decided to expand its runway and remove an obstruction that impacted airplane takeoffs and landings at Yeager.

18.     In order to make it easier for planes to take off from Yeager, the Airport Authority needed to remove an obstruction located about 4,100 feet from the Runway 5 threshold in the Northgate/Coal Branch Heights area of Charleston, West Virginia.

19.     The obstruction or "knoll," located off the south end of the main runway, needed to be removed to eliminate Federal Aviation Administration ("FAA") climb-out restrictions on aircraft departing from Yeager.

20.     At the time, the average ground obstruction was approximately fifty (50) feet with a maximum ground obstruction of up to one hundred twenty (120) feet.

21.     In addition, there were obstructions that included trees and houses.

22.     The obstructions affected departures from Runway 23 because they limited an aircraft's takeoff weight during summer months on longer routes.

23.    Due to the climb-out and weight restrictions, some flights from Yeager lost three to four seats as a result of the steep departure climb gradient.

24.    Yeager projected that airlines would save approximately two million dollars ($2,000,000.00) annually by having the FAA climb-out restriction removed since airlines were bumping passengers on some of the airlines' flights.

25.    In addition, the obstructions affected approaches to Runway 5 because there were minimums affecting visibility and Runway 5 was not available for landing during poor weather conditions.

26.    By removing the obstructions/knoll, the decision height for pilots would be lowered and visibility would be increased for landings.

27.    In 2008, the Airport Authority began acquiring land in the Coal Branch Heights and Northgate area of Charleston, West Virginia.

28.    The Airport Authority hired O.R. Colan Associates of Florida, LLC ("O.R. Colan") to assist with land purchases.

29.    In total, the Airport Authority needed to acquire approximately 39 acres of land which included sixty (60) separate properties, nine (9) residences and 3.8 acres of City of Charleston streets.

30.    Corotoman owned a large portion of the land in the Northgate/Coal Branch Heights area that included the obstructions and knoll the Airport Authority wanted to remove.

31.    In order to remove the knoll in the path of the aircraft the Airport Authority needed to acquire the land from Corotoman.

32.    On or about December 14, 1981, the Airport Authority was granted an avigation easement above the area with the obstructions/knoll at an elevation above one thousand two

hundred fifty (1250) grade feet above mean sea level as established by the United States Geological Survey ("the December 14, 1981 avigation easement").

33.      After the Airport Authority removed the knoll/obstructions, it needed to acquire a new avigation easement in the Coal Branch Height and Northgate area owned and controlled by Corotoman below one thousand two hundred fifty (1250) grade feet in order to meet the climb out restrictions for the FAA.  The new avigation easement is necessary as takeoffs and landings at Yeager occur partially through air space owned and controlled by Corotoman and below the December 14, 1981 avigation easement.

34.      An avigation easement is an easement for providing the free and unobstructed passage of all aircraft in the airspace above or in the vicinity of a particular property together with the right to cause air space noise, vibration, fumes, dust, fuel particles and all other effects caused by the operation of aircraft at a certain elevation.

35.      On or around January 2010, the Airport Authority commissioned a report from Zdrojewski and Company that discussed the cost of the land in the Coal Branch/Northgate area that the Airport Authority would need to acquire.

36.      On or about February 24, 2011, the Airport Authority asserted its entitlement to Corotoman's land through condemnation via an offer package prepared by O.R. Colan.

37.      Attached as **Exhibit A** is a true and accurate copy of the report prepared by O.R. Colan dated January 20, 2010 but sent on February 24, 2011.

38.      In response to the February 24, 2011 offer package John Wellford on behalf of Corotoman and Atkinson on behalf of the Airport Authority, began negotiating a settlement of the dispute regarding Corotoman's land and an avigation easement over Corotoman's land which

would permit Yeager and the Airport Authority to use airspace below one thousand two hundred

fifty (1250) grade feet above mean sea level as established by the United States Geological Survey.

39.    During the spring and fall of 2011, Wellford and Atkinson negotiated terms

regarding the fair market value of the land and airspace and terms that would permit the Airport

Authority to remove the knoll/obstructions, use Corotoman's airspace, yet also permit Corotoman

to use the land once the Airport Authority removed the knoll/obstructions.

40.    In addition, Wellford and Atkinson discussed the transfer of property in the

Northgate/Coal Branch Heights area owned by the Airport Authority in exchange for other

property owned by Corotoman as well as the transfer of an avigation easement from Corotoman

to Yeager/the Airport Authority.

41.    Corotoman's avigation easement was a material term of the negotiations because

Yeager and the Airport Authority wanted airplanes to be able to use Corotoman's airspace when

taking off and landing at Yeager, and ensure that the airspace owned and controlled by Corotoman

would perpetually remain free from obstructions that could prevent airplanes from taking off and

landing at Yeager.

42.    On or about October 26, 2011, Atkinson at a board of directors meeting for the

Airport Authority announced that Yeager and Corotoman had reached an agreement over

Corotoman's land and airspace at issue.

43.    Attached as **Exhibit B** is a true and accurate copy of an article published on October

26, 2011 by the Charleston Gazette-Mail in which Atkinson reported the agreement with

Corotoman to the Airport Authority.

44.    Specifically in the October 26, 2011 article, Atkinson stated that "an agreement has

been reached with Wellford, the largest single landholder in the obstruction removal zone, to make

use of [Corotoman's] land in the obstruction area in exchange for an easement and the swapping of adjacent parcels of land owned by the airport." *Id.*

45.     The Airport Authority had acquired nearly all of the approximately eighteen (18) acres in the vicinity of the knoll with offers, counteroffers and transactions taking place. *Id.*

46.     Further, Atkinson reported that in order to remove the knoll/obstructions in the Northgate/Coal Branch Heights area it would cost approximately fifteen million dollars ($15,000,000.00) and last about two years. *Id.*

47.     The funds for the work were expected to come from the federal Airport Improvement Program. *Id.*

48.     While Atkinson reported to the Airport Authority and the public that the parties had reached an agreement, no agreement was signed by Atkinson as Airport Director of the Airport Authority until on or about June 22, 2012, which he did in front of notary public Jennifer Sizemore.

49.     Attached as **Exhibit C** is a true and accurate copy of the Settlement Agreement without the attachments ("the Settlement Agreement") outlining terms of the Settlement between Corotoman and the Airport Authority.

50.     As Airport Director Atkinson has the power to bind Yeager/Airport Authority to all agreements that he enters on behalf of the Airport Authority.

51.     The Board of Directors of the Airport Authority reviewed, approved, or ratified the Settlement Agreement, the License and Work Agreement and all attachments and exhibits before Atkinson signed it on behalf of the Airport Authority.

52.     John Wellford as President of Corotoman, signed the Settlement Agreement on or about July 5, 2012 in front of notary public, Kathy Strickmaker.

53.     As outlined and stated in the Settlement Agreement, in lieu of condemnation, Corotoman, *inter alia*, agreed to convey real property by General Warranty Deed to the Airport Authority, grant a license for work to be performed on property owned by Corotoman and to grant an avigation easement to the Airport Authority. *Id.*

54.     As fair and just compensation, the Airport Authority, *inter alia*, agreed to perform certain work on Corotoman's real property in accordance with a License and Work Agreement, exchange real property with Corotoman and reimburse Corotoman for severance damages for the acquisition of property rights under the Settlement Agreement. *Id.*

55.     The Settlement Agreement together with the Exhibits which were incorporated by reference contained the entire agreement between the parties. *Id.*

56.     The work to be performed by Airport Authority on Corotoman's land was detailed in the License and Work Agreement which was attached as Exhibit A to the Settlement Agreement.

57.     A true and accurate copy of the License and Work Agreement which was incorporated by reference and attached to the Settlement Agreement is attached as **Exhibit D**.

58.     Pursuant to the requirements of the License and Work Agreement the Airport Authority was to complete the blasting, excavating and grading on the property owned, in part or in whole, by Corotoman in strict accordance with the Grading and Construction Plans, Specifications, and Schedules set forth in the License and Work Agreement. *Id.* ¶ 5.

59.     Pursuant to the License and Work Agreement, the Airport Authority agreed to "overblast at least thirty-five (35) feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules." *Id.*

8

60.     Critically, the Airport Authority also agreed that "the finished grade will be at least ten (10) feet below the elevation of the planned Avigation Easement at any point on the area covered by [the License and Work Agreement] and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules." *Id.*

61.     The Airport Authority agreed that the work would be commenced by the end of 2012 and completed within twenty-four (24) months after commencement and that time is of the essence in the completion of the work. *Id.* ¶ 6.

62.     For purposes of the License and Work Agreement, the completion of the work shall only occur when Corotoman receives a copy of a duly executed certificate of substantial completion or similar document, signed by an engineering professional licensed by the State of West Virginia and evidencing that the Project has been substantially completed in accordance with the Grading and Construction Plans, Specifications, and Schedules. *Id.* ¶ 7.

63.     All costs of the work, grading and construction would be borne by the Airport Authority. *Id.* ¶ 9.

64.     Any notice or communications regarding the License and Work Agreement was to be in writing and delivered to Corotoman with a copy to its attorney at Robinson & McElwee, PLLC and to the Airport Authority with a copy to its attorney at Bailey & Wyant, PLLC. *Id.* ¶ 14.

65.     If the Airport Authority failed to strictly abide by the terms and conditions set forth in the License and Work Agreement, then its acts constituted a material breach. *Id.* ¶ 15.

66.     The Airport Authority specifically agreed that "any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents; loss of use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs; and annoyance and inconvenience." *Id.*

67.     Therefore, in the event of a breach occurring after commencement of the Project, Corotoman may, in its discretion and as the circumstances reasonably dictate, revoke the License granted herein and/or seek the greater of either (1) actual, compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ($10,000.00) per breach." *Id.*

68.     Atkinson signed the License and Work Agreement as Airport Director and on behalf of the Airport Authority. *Id.* at p. 7.

69.     The Board of Directors of the Airport Authority also reviewed, approved, or ratified the License and Work Agreement.

70.     Wellford as President of Corotoman signed the License and Work Agreement. *Id.* at p. 7.

71.     The Settlement Agreement and License and Work Agreement was mentioned in a March 4, 2015 presentation entitled "Runway 5 Ground Obstruction Removal – A 10-Year Journey" by L.R. Kimbell to the Airport Authority.

72.     Attached as **Exhibit E** is a true and accurate copy of the March 4, 2015 presentation "Runway 5 Ground Obstruction Removal – A 10-Year Journey" by L.R. Kimbell.

73.     In the March 4, 2015 presentation, L.R. Kimbell stated, *inter alia*, that:

> a.  Vast majority of the land in Coal Branch was owned by [Corotoman], a local developer;
> b.  ***The Airport Authority negotiated a Land-Use Agreement with Corotoman;***
> c.  A total of 10 properties were acquired through eminent domain;
> d.  Last property was acquired in early 2013;
> e.  Total Value of Land Acquisition = $958,400;
> f.  Site was primarily the top of a hill with a ridge running through the middle;
> g.  Site was to be cut to 10 feet below the departure service elevation;
> h.  Depth of cut varied from 15 feet to 95 feet. *Id.* at 6-7. (emphasis added).

74.     Pursuant to the Settlement Agreement and attached as Exhibits B and B-1, Corotoman was to convey real property, free of all liens and encumbrances except those of record in the office of the Clerk of the Kanawha County Commission to the Airport Authority.

75.     Attached as **Exhibit F** is a true and accurate copy of Exhibit B and B-1 to the Settlement Agreement.

76.     Pursuant to the Settlement Agreement and attached as Exhibits C and C-1, the Airport Authority was to convey real property, free of all liens and encumbrances except those of record in the office of the Clerk of the Kanawha County Commission to Corotoman.

77.     Attached as **Exhibit G** is a true and accurate copy of Exhibit C and C-1 to the Settlement Agreement.

78.     Pursuant to Section 3.04 of the Settlement Agreement and contingent upon the exchange of real property exchanged in Sections 3.02, 3.03 and Section 4 of the Settlement Agreement, Corotoman agreed to provide the Airport Authority with an Avigation Easement in the substantially similar to the form as the instrument attached as Exhibit D to the Settlement Agreement.

79.     Attached as **Exhibit H** is a true and correct copy of the Avigation Easement attached to the Settlement Agreement as Exhibit D, D1, D2 and D3.

80.     Pursuant to the draft Avigation Easement, Corotoman would grant the Airport Authority an exclusive easement for the free, unobstructed use and passage of all types of aircraft in and through the portions of the Aircraft Approach Zone exceeding the Base Easement Elevation. *Id.* ¶ 2.

81.     The "Base Easement Elevation" is defined as "[t]he elevation of said imaginary plane shall be calculated for any point within the Aircraft Approach Zone using the calculation set forth on **Exhibit D-3**."

82.     Essentially, the Avigation Easement granted the Airport Authority the ability for airplanes to fly below the 1250 foot requirement for which it did not previously have an avigation easement.

83.     Corotoman agreed for itself and its successors and assigns in ownership of the property at issue that "no improvement of any type shall be constructed or placed on the Subject Property in such as a way to interfere with or obstruct the Avigation Easement." *Id.* ¶ 4.

84.     "Notwithstanding this covenant, Corotoman, its successors and assigns, employees, agents, and contractors shall retain the absolute right to construct any and all improvements on the Subject Property, so long as said improvements do not exceed the Base Easement Elevation, and shall be entitled to make any and all reasonable uses of the Subject Property that do not interfere with the Airport Authority's rights hereunder." *Id.*

85.     Due to the granting of the Avigation Easement and for the loss of and limitations placed upon Corotoman's property interests and pursuant to the terms set forth in the Settlement Agreement trade and to perform the work as agreed to in the Licenses and Work Agreement, the Airport Authority agreed to pay Corotoman two hundred fifty thousand dollars ($250,000.00).

86.     Due to the limitations placed upon Corotoman's property interests due to the License and Work Agreement, the Airport Authority agreed to pay Corotoman one hundred thousand dollars ($100,000.00).

87.     The total sum of three hundred fifty thousand dollars ($350,000.00) was owed to Corotoman which was due and payable upon execution of the Settlement Agreement.

88.     Both parties agreed to transfer all their interest in real property within sixty (60) days of execution of the Settlement Agreement at a Closing.

89.     At Closing, the parties were to exchange and record the deeds for the real property identified in Exhibits B and C of the Settlement Agreement as well as the Avigation Easement identified as Exhibit D.

90.     At all relevant times Corotoman was willing and able to meet the Closing deadlines.

91.     However, the Airport Authority was not ready to close, and the Closing as outlined in Section Four of the Settlement Agreement has never taken place.

92.     The license for Airport Authority to perform work on Corotoman's property was to be given in a separate agreement – the License and Work Agreement, which had to be executed within thirty (30) days of the execution of the Settlement Agreement.

93.     While the Airport Authority committed to commencing the work on the Project no later than December 31, 2012 pursuant to the License and Work Agreement, construction did not begin until September 2013.

94.     On or about September 18, 2013, the Airport Authority entered into a contract with Central Contracting, Inc. ("Central Contracting") from St. Albans, West Virginia to identify, negotiate, permit and construct a waste area and remove the knoll and obstructions in the Coal Branch Heights/North Gate Area.

95.     The contractor hired to remove trees and chip all limbs from the site was S&E Clearing and Hydroseeding of Pineville, West Virginia.

96.     The blasting subcontractor was hired to blast was Dyno Nobel from Charleston who handled all of the blasting, and Sauls Seismic, Inc. from Logan West Virginia provided the Pre-Blast Surveys and Seismic Monitoring.

97.    While blasting was supposed to start in January 2014, it did not start until on or about February 17, 2014.

98.    Due to the need to remove earth and rock from the site, an adjacent valley that was primarily owned by Corotoman was identified as a place that the earth and rock would be wasted.

99.    On or about March 5, 2014, Corotoman and Central Contracting entered into a License Toll and Work Agreement in order to use Corotoman's access roads to remove Excavated Material from the Coal Branch Heights/North Gate park area for the Airport Authority's benefit.

100.    Attached as **Exhibit I** is a true and accurate copy of the License Toll and Work Agreement between Corotoman and Central Contracting.

101.    In or about early 2015, Corotoman discovered that the Airport Authority had not strictly abided by the terms and conditions of the License and Work Agreement.

102.    Specifically, Corotoman learned that the Airport Authority had not overblasted at least thirty-five (35) feet below the planned final grade and that the Airport Authority had not complied with the terms of the Settlement Agreement and the License and Work Agreement.

103.    Due to the Airport Authority's material breach of the License and Work agreement and the Settlement Agreement, Corotoman has been unable to use its land because the Airport Authority did not comply with the Settlement Agreement and the incorporated exhibits.

104.    In early 2015, Wellford on behalf of Corotoman and Atkinson on behalf of the Airport Authority began negotiating a potential resolution.

105.    However, while Wellford and Atkinson were in the process of negotiating a potential resolution on March 12, 2015, the safety area at the end of Runway 5 catastrophically failed sending hundreds of thousands of cubic yards of fill and other material down onto the

14

Keystone Drive area of Charleston destroying homes, a church, public roads and damming a stream.

106.    Therefore, in order to assist the Airport Authority with stabilizing the failed slope by Runway 5 and compensate Corotoman for the Airport Authority's failure to strictly abide by the terms of the License and Work Agreement, Corotoman and the Airport Authority began negotiating an "Amendment to License and Work Agreement".

107.    Attached as **Exhibit J** is a draft Amendment to License and Work Agreement.

108.    Upon information and belief the draft Amendment to License and Work Agreement was created on or about March 29, 2015.

109.    Pursuant to the terms of the draft Amendment to License and Work Agreement, Corotoman would agree for the Airport Authority to enter certain of its property to remove rock and earth to help stabilize the slope that had failed on Runway 5. *Id.*

110.    In addition, pursuant to the terms of the draft Amendment to License and Work Agreement, Corotoman was to permit the Airport Authority the ability to transport the material over Corotoman's properties. *Id.*

111.    Pursuant to the terms of the draft Amendment to License and Work Agreement, the Airport Authority was to ensure that the finished grade for the area where it removed the remove rock and earth on Corotoman's property would be suitable for commercial development and graded and rolled in a good and workmanlike manner with the final grade approximately thirty-five (35) feet lower than the planned final grade set forth in the License and Work Agreement and at least forty-five (45) feet below the elevation of the avigation easement. *Id.* ¶ 5.

112.    The draft Amendment to the License and Work Agreement states that, pursuant to a payment planned outlined in the amendment, the Airport Authority would pay Corotoman three

million five hundred thousand dollars ($3,500,000.00) as a settlement for not complying with the License and Work Agreement. *Id.* ¶ 10.

113.    However, the Amendment to the License and Work Agreement was not signed by either Corotoman or the Airport Authority.

114.    On or about May 29, 2015, pursuant to the terms in the draft Amendment to the License and Work Agreement, the Airport Authority wrote a check for sixty thousand dollars ($60,000.00) to Corotoman, signed by Atkinson.

115.    Attached as **Exhibit K** is a true and accurate copy of the check from the Airport Authority to Corotoman for $60,000 from May 29, 2015.

116.    On or about June 22, 2015, Airport Authority wrote a check for fifty thousand dollars ($50,000.00) to Corotoman, signed by Atkinson and Lewis.

117.    Attached as **Exhibit L** is a true and accurate copy of the check from the Airport Authority to Corotoman for $50,000 from June 22, 2015.

118.    On or about June 26, 2015, pursuant to the terms of the payment contained in the draft Amendment to the License and Work Agreement, the Airport Authority wrote a check for three hundred ninety thousand dollars ($390,000.00) to Corotoman, signed by Atkinson and Sayre.

119.    Attached as **Exhibit M** is a true and accurate copy of the check from the Airport Authority to Corotoman for $390,000 from June 26, 2015.

120.    After making the payment on June 26, 2015, Corotoman stopped receiving any additional funds pursuant to the Draft Amendment to the License and Work Agreement.

121.    On or about July 20, 2015, Atkinson resigned as the Director of Airport Authority.

122.    On or about July 22, 2015, Sayre was named the permanent Director for Airport Authority.

123.    Since the Airport Authority was not following through with its representations and agreements contained in the Settlement Agreement, the License and Work Agreement or the draft Amendment to the License and Work Agreement and pursuant to the notice requirements, on or about September 4, 2015, Kent J. George ("George") sent a letter on behalf of Corotoman to Charles R. Bailey ("Bailey"), attorney for the Airport Authority .

124.    Attached as **Exhibit N** is a true and accurate copy of September 4, 2015 letter.

125.    The September 4, 2015 letter notified the Airport Authority that it had not completed the work pursuant to the Settlement Agreement or the License and Work Agreement. *Id.*

126.    George further advised that, due to the failure of the Airport Authority for not completing the work as agreed, "the consequential damages" are significant. *Id.*

127.    In light of the catastrophic failure of Runway 5, Corotoman expressed a desire to work "cooperatively" with the Airport Authority in order "to reach a mutually agreeable resolution" of the issues present rather than declaring the Airport Authority in breach of the Settlement Agreement and License and Work Agreement. *Id.*

128.    Thereafter, towards the end of 2015, Wellford met with R. Edison Hill ("Hill"), the Chairman of the Board for the Airport Authority, about potentially resolving the issues between Corotoman and the Airport Authority.

129.    Thereafter, in 2016, Corotoman and the Airport Authority began working on negotiating amendments to the Settlement Agreement and another draft Amendment to the License and Work Agreement.

130.    Attached as **Exhibit O** is a true and accurate copy of a June 18, 2016 draft "Amendment to License and Work Agreement."

131.    Attached as **Exhibit P** is a true and accurate copy of a June 18, 2016 draft "2016 Amendment to Settlement Agreement."

132.    The June 18, 2016 drafts of the "Amendment to License and Work Agreement" and the "2016 Amendment to Settlement Agreement" were authored mutually by George and Bailey. *Id.*

133.    As shown in the draft "2016 Amendment to Settlement Agreement" and "2016 Amendment to License and Work Agreement," the parties discussed that the Airport Authority had not performed the work it had previously agreed to perform and the parties had not yet conveyed the real property previously agreed to, and Corotoman had not conveyed the Avigation Easement to the Airport Authority.

134.    Therefore, Corotoman and the Airport Authority were working on terms to Amend the Settlement Agreement and the License and Work Agreement.

135.    In the draft "2016 Amendment to Settlement Agreement" the parties, *inter alia*, discussed that the conveyance of the real property identified in the original Settlement Agreement would be conveyed between the parties within sixty (60) days of signing the 2016 Amendment to Settlement Agreement.

136.    In the 2016 Amendment to License and Work Agreement, the Airport Authority and Corotoman discussed how there was certain work that had been agreed to be performed by the Airport Authority on Corotoman's real property.

137.    The draft 2016 Amendment to License and Work Agreement stated, *inter alia*, that the Airport Authority would not have any additional obligations to perform the overblast work on Corotoman's property, and, as long as the Airport Authority complied with certain conditions,

Corotoman would provide the Airport Authority with the ability to remove rock and earth from Corotoman's property.

138.    As compensation for waiving its right to demand that the Airport Authority complete the overblast work as identified in the original License and Work Agreement, the 2016 Amendment to the License and Work Agreement stated that Corotoman would receive three million five hundred thousand dollars ($3,500,000.00) in total.  Since the Airport Authority had already paid Corotoman five hundred thousand dollars ($500,000.00), the Airport Authority would only pay the remaining three million dollars ($3,000,000.00).

139.    However, neither of the 2016 Amendments to the Settlement Agreement or the License and Work Agreement were finalized.

140.    On July 20, 2016, Corotoman's attorneys met with the Airport Authority's attorneys to discuss next steps with potentially resolving the issues between the Airport Authority and Corotoman.

141.    On or about August 1, 2016, Bailey sent a letter on behalf of Airport Authority to George stating, *inter alia*, that the FAA was refusing to approve the land agreement in exchange for the avigation easement as originally agreed in the Settlement Agreement, and that the Airport Authority would take whatever action is necessary to acquire the Avigation Easement without giving any additional consideration other than what has previously been given.

142.    Attached as **Exhibit Q** is a true and accurate copy of the August 1, 2016 letter from Bailey to George.

143.    To date, the Airport Authority has not performed the work as required by the License and Work Agreement or the Settlement Agreement.

144.    In addition, the Airport Authority has not conveyed the real property to Corotoman as required by the Settlement Agreement.

145.    Corotoman remains ready, willing and able to transfer the Avigation Easement and the real property identified in the Settlement Agreement upon confirmation that the Airport Authority will perform the work identified in the License and Work Agreement and the exchange of real property from the Airport Authority to Corotoman.

146.    All conditions precedent for filing this action have been met or waived.

147.    This action is timely filed before the expiration of any statutes of limitations or statutes of repose.

148.    Upon information and belief, the Airport Authority has permitted aircraft, including planes and helicopters, to fly through the airspace owned and controlled by Corotoman.

149.    However, the Airport Authority has not received an avigation easement by prescription through the airspace owned and controlled by Corotoman.

150.    The Airport Authority is also equitably estopped from relying upon a statute of limitations defense, to the extent any such defense applies to Corotoman's claims because the Airport Authority, at all times, assured Corotoman and its agents that it would comply with its obligations under the License and Work Agreement and the Settlement Agreement.

151.    Notwithstanding the allegations set forth above, the Airport Authority affirmatively assured Corotoman that they were working to comply with the obligations set forth in the Agreements.

152.    The Airport Authority intended by its actions and omissions and assertions that it would comply with the Settlement Agreement and the License and Work Agreement would be relied upon by Corotoman.

153.    Corotoman reasonably relied on the Airport Authority's affirmative statements regarding its purported compliance with the obligations under the Settlement Agreement and License and Work Agreement and delayed filing this action until now in hopes the parties could resolve this matter without the need to resort to litigation.

154.    All conditions precedent for filing this action have been met.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract-Settlement Agreement and License and Work Agreement)**

155.    Corotoman realleges and incorporates by reference Paragraphs 1 through 154.

156.    Pursuant to the Settlement Agreement and the License and Work Agreement, a valid and enforceable contract existed between Corotoman and the Airport Authority.

157.    Pursuant to the License and Work Agreement, the Airport Authority agreed to "overblast at least thirty-five (35) feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules."

158.    The Airport Authority also agreed that "the finished grade will be at least ten (10) feet below the elevation of the planned Avigation Easement at any point on the area covered by [the License and Work Agreement] and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules."

159.    The Airport Authority agreed that the work would be commenced by the end of 2012 and completed within twenty-four (24) months after commencement and that time is of the essence in the completion of the work.

160.    The Airport Authority failed to perform its obligations pursuant the Settlement Agreement and the License and Work Agreement.

161.   The Airport Authority has failed to transfer real property as agreed to by the Settlement Agreement.

162.   The Airport Authority, by and through its conduct and actions or the conduct and actions of its agents as described herein, breached material terms of the contracts, the Settlement Agreement and the License and Work Agreement.

163.   Corotoman has been damaged as a result of the Airport Authority's breach because the work it contracted with Airport Authority to complete has never been completed, and Corotoman is unable to use the property as contemplated and anticipated at the time of entering into the License and Work Agreement and the Settlement Agreement.

164.   The Airport Authority has committed material breaches of the Settlement Agreement and License and Work Agreement by, *inter alia*:

> a.   Failing to comply with the terms of the License and Work Agreement;
>
> b.   Failing to transfer property as required by the Settlement Agreement;
>
> c.   Permitting aircraft to fly through Corotoman's airspace; and
>
> d.   In other ways to be shown through discovery and at trial.

165.   Due to the substantial and material breaches of the License and Work Agreement by Airport Authority Corotoman is entitled to seek the greater of either (1) actual, compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ten thousand dollars per breach.

166.   Corotoman remains ready willing and able to perform all of its obligations in the Settlement Agreement and License and Work Agreement upon confirmation that the Airport Authority will meet each of its obligations.

167.   All conditions precedent for asserting this claim have been met.

168.    By reason of the foregoing, Airport Authority is liable to Corotoman for the damages Corotoman has suffered as a result of Airport Authority's actions, in an amount o to be determined at trial, plus attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract - Breach of Good Faith and Fair Dealing)**

169.    Corotoman realleges and incorporates by reference Paragraphs 1 through 168.

170.    Every contract in West Virginia contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.

171.    The License and Work Agreement and the Settlement Agreement are valid contracts.

172.    The Airport Authority has never completed the work on Corotoman's real property as agreed to by the Settlement Agreement and the License and Work Agreement.

173.    Corotoman reasonably expected that Airport Authority would commence and complete the work as agreed in the Settlement Agreement and License and Work Agreement.

174.    Without these reasonable expectations, Corotoman would not have agreed to the Settlement Agreement and the License and Work Agreement with the Airport Authority.

175.    The Airport Authority breached the implied covenant of good faith and fair dealing by not commencing and completing the work as described in the License and Work Agreement and frustrating Corotoman's reasonable expectations.

176.    The Airport Authority breached the implied covenant of good faith and fair dealing by permitting aircraft to fly through Corotoman's airspace.

177.    As a result of the Airport Authority's material and substantial breaches it is liable to Corotoman for actual damages in an amount to be determined at trial and attorneys' fees.

### THIRD CLAIM FOR RELIEF
**(Breach of Quasi-Contract)**
*(Pleading in the Alternative)*

178.   Corotoman realleges and incorporates by reference Paragraphs 1 through 177.

179.   Corotoman relied upon the promises of the Airport Authority and its agents, including the affirmations, representations and conduct of the Airport Authority to perform work on Corotoman's real property with the ordinary skill, care and diligence in a skillful, careful and workmanlike manner and in accordance with the industry standards for overblasting.

180.   The Airport Authority reasonably expected Corotoman to rely upon its promises and Corotoman did, in fact, rely upon the Airport Authority's promises.

181.   The Airport Authority intended to induce Corotoman to rely on its misrepresentations that it would perform the work on Corotoman's real property in accordance with the scope of work outlined in the License and Work Agreement.

182.   The Airport Authority breached the terms of the implied contract by failing to perform the work on Corotoman's property in accordance with the License and Work Agreement.

183.   By virtue of the Airport Authority's breach, it has been unjustly enriched because it was able to remove the knoll/obstruction on Corotoman's property, but it did not perform the work as agreed to in the License and Work Agreement.

184.   Further, the Airport Authority was unjustly enriched because it induced Corotoman to settle a disputed condemnation proceeding on the basis of the Airport Authority's representations that it would perform the work on Corotoman's property in conformance with the License and Work Agreement.

185.    As a result of the breaches by Airport Authority, it is liable to Corotoman for actual damages in an amount to be determined at trial, and attorneys' fees.

### FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment)

186.    Corotoman realleges and incorporates by reference Paragraphs 1 through 185.

187.    This action concerns whether there was a valid Settlement Agreement and License and Work Agreement entered into between Corotoman and the Airport Authority.

188.    An actual controversy exists between Corotoman and the Airport Authority. Accordingly, a declaration is necessary and proper at this time.

189.    Specifically, Corotoman seeks an order of this Court that the Settlement Agreement and the License and Work Agreement were valid contracts between the parties.

190.    Accordingly, Corotoman seeks a judicial determination of its rights and duties as well as the Airport Authorities rights and duties with respect to the Settlement Agreement and the License and Work Agreement.

### PRAYER FOR RELIEF

WHEREFORE, Corotoman prays for a judgment against the Airport Authority, as follows:

1.    For actual and compensatory damages;

2.    Costs of suit;

3.    Pre- and post-judgment interest;

4.    For a judgment that the Settlement Agreement and the License and Work Agreement are valid and enforceable contracts;

5.    For specific performance of the Settlement Agreement;

6.    For specific performance of the License and Work Agreement;

7.    For equitable relief;

8.  Reasonable attorneys' fees; and

9.  Such other relief as allowed by law the Court may find appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 24th day of September, 2019.

_____
James C. Wright
W.VA Bar No. 6816
**HARTLEY LAW GROUP, PLLC**
2001 Main Street, Suite 600
Wheeling, West Virginia 26003
Phone (304) 233-0777
Facsimile (304) 233-0774
jwright@hartleylawgrp.com

*/s/ John F. Leaberry*
John F. Leaberry (WV Bar 2168)
**LEABERRY LAW FIRM PLLC**
167 Patrick Street
Lewisburg, WV 24901
T: 304.645.2025 F: 888.469.6631

Scott C. Harris (to seek admission *pro hac vice*)
N.C. Bar No. 35328
Andrew D. Hathaway (to seek admission *pro hac vice*)
N.C. State Bar No. 36801
**WHTFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, North Carolina 27603
Phone (919) 600-5000
Facsimile (919) 600-5035
scott@wbmllp.com
drew@wbmllp.com